Filed 5/9/22  P. v. Sanchez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LEONDEZ VASQUEZ SANCHEZ,<br><br>    Defendant and Appellant. | H048245<br>(Santa Clara County<br>Super. Ct. No. C1525602) |

A jury convicted appellant Leondez Vasquez Sanchez of 10 counts of committing a lewd or lascivious act on a child under age 14 (Pen. Code, § 288, subd. (a)[1]) and one count of attempted commission of such an act on a child under age 14 (§§ 664, 288, subd. (a)).  Sanchez had committed the crimes against three children, and the jury found true 10 multiple-victim allegations (§ 667.61, subds. (b) & (e)(4)).  The trial court imposed a sentence of 60 years to life in prison plus three years.

On appeal, Sanchez contends his trial counsel was prejudicially ineffective for failing to object to comments made by the prosecutor in closing argument about child sexual abuse accommodation syndrome (CSAAS) evidence.  Sanchez further contends the prosecutor's allegedly improper comments highlighted ambiguities in a related jury

_____

[1] Unspecified statutory references are to the Penal Code.

instruction (CALCRIM No. 1193) and likely resulted in a misapplication of that instruction.

For the reasons explained below, we affirm the judgment.

# I. FACTS AND PROCEDURAL BACKGROUND

A. *Procedural History*

In January 2020, during trial, the Santa Clara County District Attorney filed a third amended information (information) charging Sanchez with 12 sex crimes involving three minors, Fatima Doe, Beatriz Doe, and Giselle Doe.[2]

Counts 1 through 4 of the information alleged crimes committed against Fatima between January 5, 2002, and January 4, 2009, namely three counts of a lewd or lascivious act on a child under age 14 (§ 288, subd. (a); counts 1, 2 & 4) and one count of attempted lewd or lascivious act on a child under age 14 (§§ 664, 288, subd. (a); count 3). Counts 5 through 10 alleged a lewd or lascivious act on a child under age 14 committed against Beatriz between April 6, 1997, and April 5, 2001 (§ 288, subd. (a); counts 5–10). Counts 11 and 12 alleged a lewd or lascivious act on a child under age 14 committed against Giselle on or about December 20, 2007 (§ 288, subd. (a); counts 11–12). The information also alleged a multiple-victim enhancement for each count except count 3 (§ 667.61, subds. (b) & (e)).

On January 16, 2020, the jury found Sanchez guilty on all counts except count 4, for which the jury could not reach a verdict. The jury also found true the multiple-victim enhancement allegations as charged, except on count 4. The trial court subsequently granted the district attorney's motion to dismiss count 4.

---

[2] "Doe" is a pseudonym used in the information for all three minor victims and at trial for other witnesses as well. We refer to the minor victims and other witnesses by their first names for ease of reference and to protect their privacy interests. (See Cal. Rules of Court, rule 8.90(b)(4), (10)–(11).)

On June 26, 2020, the trial court sentenced Sanchez to an aggregate indeterminate term of 60 years to life in prison plus a determinate term of three years, comprising consecutive 15-year-to-life terms on counts 1, 5, 6, and 12, to run consecutively to the three-year term on count 3, and concurrent 15-year-to-life terms on counts 2, 7, 8, 9, 10, and 11.

Sanchez timely appealed.

B. *Evidence Presented at Trial*

    1. <u>Prosecution Evidence</u>

    a. Evidence Regarding Crimes Against Fatima

Fatima was born in 1998 and was almost 22 years old at the time of trial. Though born in Mexico, Fatima grew up in San Jose and eventually became a United States citizen. Fatima's mother is Micaela. Micaela has a sister, Rosa. Rosa was Sanchez's wife and is the mother of their three children, including Monica (who is younger than Fatima). During childhood, Fatima lived with her mother and stepfather, Rufino, at Sanchez's residence in San Jose, along with Rosa, Rosa's and Sanchez's children, and Rosa's and Micaela's mother, Juana. According to Fatima, Sanchez and Rosa shared a bedroom; Micaela and Rufino shared another bedroom; and Juana shared a third bedroom with the children.

Fatima testified that she "vaguely" recalled Sanchez doing "something inappropriate" to her. Fatima's first memory of Sanchez touching her was from when she was in the first grade. She was in bed in Sanchez's room with Sanchez and Monica, watching television. Sanchez said he was going to hug Monica. He then reached over Monica and touched Fatima's vagina in a circular motion with his fingers, over and under her clothes. Fatima did not know at the time that Sanchez had touched her inappropriately. Sanchez touched Fatima in a similar fashion "a lot of times after that."

3

Fatima recalled another occasion from around the same time period when Sanchez reached over Monica, grabbed Fatima's hand, and placed it on his penis, over his clothes. Similar incidents occurred more than 10 times. Sanchez told Fatima not to tell anyone.

One night, when Fatima was asleep on a top bunk in the children's bedroom, Sanchez entered, drunk. Fatima awoke when Sanchez started shaking the bed. He told Fatima to go to his room to do what they had done before. She refused. Sanchez tried to pull Fatima out of her bed but failed because she resisted. Fatima was less than 10 years old at the time. After Sanchez left the room, Fatima's grandmother Juana told Fatima to go back to sleep. The next day, Juana told Fatima not to tell anyone about the incident or she (Fatima) would be punished. Fatima believed she would get in trouble if she were to tell her mother.

Fatima testified that she recalled another, later incident during which she was laying on her stomach on the edge of a bed, without any pants on, in a dark bedroom and her vagina hurt a lot. There was a man behind her at the time, but she did not know who it was—although she testified that she believed it was Sanchez who touched her with his penis.[3]

During Fatima's childhood, her mother Micaela worked intermittently in Colorado. Fatima traveled back and forth between San Jose and Colorado from around the age of 10 until she moved to Colorado when she was about 13 or 14. When Fatima was 17 years old (in 2015), she was depressed and engaging in self-harm. While talking to a therapist at the urging of school officials, Fatima disclosed that she had suffered sexual abuse. Unbeknownst to Fatima, the therapist informed police, and Colorado authorities interviewed Fatima. Fatima told the authorities that she believed another relative, her maternal cousin Beatriz, had also been molested by Sanchez. Colorado authorities informed the San Jose Police Department about Fatima's report of abuse, and

---

[3] Count 4 alleged a violation of section 228, subdivision (a), for this incident. The jury could not reach a verdict on that count.

4

San Jose Police Detective Michael Nasser spoke to Fatima. At the behest of San Jose Police, Colorado authorities then conducted a forensic interview of Fatima. Fatima testified that she did not talk to police earlier about the abuse because she "wasn't ready to talk about it" and "didn't want to cause problems." She also had learned about sexual abuse in high school and recognized that Sanchez had hurt her.

As part of the police investigation, Detective Nasser arranged for Fatima to make a pretext call to Sanchez. In a September 2015 pretext call, Fatima confronted Sanchez about the molestation. Sanchez said that he did not remember touching Fatima's vagina. He explained, "I think I was drunk, I don't know." He also said, "If I did it, I think I was drunk but no–not [*sic*] I don't think I would have hurt you if I was sober." Sanchez explained further that people do "stupid shit" when they are drunk. He also told Fatima to "[j]ust get married" and forgive him if he did something to her.

After Fatima disclosed the molestation, Sanchez's wife Rosa accused Fatima of lying, trying to obtain a "U Visa," and ruining Rosa's family. Fatima admitted at trial that she had done research about a U-Visa.[4]

b. Evidence Regarding Crimes Against Beatriz

Beatriz was born in April 1987 and was 32 years old at the time of trial. Beatriz was raised by her grandmother Juana, whom she referred to as her mother. While growing up in Mexico, Beatriz lived for a time with her Aunt Rosa and Sanchez. When Beatriz was between five and six years old, Sanchez grabbed her, laid her on his bed, pulled her pants down, and put his penis in her vagina. In addition, Sanchez touched her

---

[4] A supervising deputy district attorney testified that an undocumented crime victim may apply for a U-Visa which, if approved by the district attorney and ultimately granted by the federal immigration authorities, permits the undocumented individual to remain in the United States temporarily and then apply for permanent resident status. As a matter of policy in Santa Clara County, the district attorney does not approve a U-Visa application until the conclusion of the case, but there are exceptions. Under certain circumstances, family members of a crime victim are eligible to apply for a U-Visa.

vagina and breasts at "every opportunity he had" while they lived in Mexico. Beatriz felt ashamed and did not tell anyone about the abuse.

Beatriz moved to the United States when she was eight or nine years old. After living for a few years with Juana and her relatives at a house in Greenfield (Monterey County), Beatriz and Juana moved into an apartment in Greenfield with Rosa, Sanchez, and their children. Beatriz was then 11 years old. She went to school and worked at a relative's bakery on weekends and sometimes after school. Sanchez drove Beatriz to the bakery on weekends and took her on errands. During these drives, Sanchez touched Beatriz's breasts and vagina and put her hand on his penis. The touching occurred both over and under their clothes, more than twice a week. Beatriz was not afraid of Sanchez, but she did not like being near him and sometimes pushed his hand away or pulled her hand away from him.

Sanchez also molested Beatriz when they were alone in their apartment. Sanchez grabbed Beatriz and made her go into his bedroom. There, he touched her breasts and vagina (putting his fingers inside her) and made her touch his penis. When Sanchez saw Beatriz try to get away or heard someone coming, he would stop. Beatriz recalled that these acts occurred more than two times but fewer than fifty times.

Eventually, when Beatriz was 13 or 14 years old, she told Juana that Sanchez was touching her. Juana pinched Beatriz and told her to be quiet because her cousin Lupita (Rosa's daughter) was present for the conversation. Juana did not want Beatriz to say anything about what was happening because they did not pay rent while living with Sanchez and Rosa. Previously, when Beatriz and Juana had first lived with Juana's relatives in Greenfield, a man molested Beatriz and Juana similarly told Beatriz to deny that anything had happened because they were living there for free. After informing Juana about Sanchez's molestation, Beatriz did not raise the issue again, but Beatriz told Juana that she wanted to move. In September 2001, when Beatriz was 14 years old, she and Juana moved to Mexico. Beatriz lived there with Juana from age 14 to 17.

6

Beatriz moved back to the United States when she was 17 years old. Having no other place to go, she lived at Rosa's and Sanchez's residence in San Jose. One day when Sanchez grabbed Beatriz's hand and "tried to do the same thing" he had done to her previously, Beatriz told him to stop or she would "speak up." Sanchez then stopped bothering her. After about a year, Beatriz met her first husband and moved out of Sanchez's house.

Eventually, Beatriz told her husband (from whom she was then separated) that she had been abused, and he encouraged her to tell the police. When Beatriz was around 21 or 22 years old, she talked with a female police officer in Greenfield. After Beatriz reported Sanchez's molestation, her family told her that she was crazy and lying. Later, after Sanchez had been arrested based on Fatima's accusations in 2015, Beatriz spoke to a San Jose police officer.

Beatriz cut off contact with her family, but Rosa once (in Los Angeles) asked Beatriz to write a letter saying that all her allegations against Sanchez were a lie. Beatriz told Rosa that she would write such a letter but never did. Rosa also sent messages to Beatriz about deportation and having her children taken away from her. Later, when speaking with a deputy district attorney and an investigator in September 2018, Beatriz inquired about a U-Visa and was told to raise that after trial.

c. Evidence Regarding Crimes Against Giselle

In December 2007, when Giselle was three years old, her mother, Danelia, was friends with Rosa. Danelia worked, and Rosa helped care for Giselle by picking her up from daycare about 4:00 p.m. Danelia would then pick up Giselle from Rosa's house between 7:00 p.m. and 8:00 p.m.[5]

---

[5] At trial, Giselle testified that she had no recollection of ever seeing Sanchez, being cared for by Rosa, or having anyone touch her private parts or kiss her inappropriately when she was young. Giselle did not know Fatima or Beatriz.

7

On the evening of December 20, 2007, when Danelia arrived to pick up Giselle at Rosa's house, Giselle was standing at the door, which was unusual. To Danelia, Giselle appeared a little distressed. Giselle told Danelia that Sanchez (whom Giselle had referred to by his nickname) had touched her. Rosa was standing next to Giselle and looked surprised.

Danelia left the house with Giselle and, at Giselle's request, took her to Starbucks for a hot chocolate. In the restroom there, Danelia asked Giselle what had happened. Giselle told Danelia that Sanchez had touched her "cosita" and put his "huevos" on her underwear. Danelia understood Giselle to say that Sanchez had touched her vagina and put his penis on her underwear. Giselle also told Danelia that Sanchez had kissed her in the way that Danelia kisses her boyfriend (i.e., on the mouth). In their car on the way home, Giselle put her hand over her vagina and said that it hurt.

A day or two later, Danelia contacted police. The police talked to Giselle and had her medically examined. At that time, law enforcement authorities decided not to pursue the matter. They told Danelia that Giselle was very young, and they could not determine whether she was credible. Additionally, Danelia talked to Rosa about what Giselle had said. Rosa became angry and said it was not true.

d. Evidence Regarding CSAAS

Psychologist Anna Washington testified as an expert on child sexual abuse accommodation syndrome (CSAAS). Dr. Washington had not talked to the victims in this case, did not know the specific facts of the case, and did not offer any opinion regarding whether the victims had been sexually abused.

Dr. Washington described the five categories of CSAAS: Secrecy; helplessness; entrapment and accommodation; delayed, conflicted, and unconvincing disclosure; and retraction or recantation. Dr. Washington explained that CSAAS is not a mental health diagnosis; that is, "it's not something that should be used to diagnose a particular child or determine whether . . . a particular defendant is guilty." Rather, CSAAS is a description

8

of a "pattern of reacting to child sexual abuse" commonly seen in children, but not every child victim will exhibit all of the reactions. "It's merely . . . an explanatory framework to dispel some common myths about sexual abuse and to better understand how victims commonly react."

With respect to secrecy, Dr. Washington explained that most child sexual abuse involved a preexisting relationship between the child and perpetrator. The perpetrator might manipulate the relationship through threats, intimidation, or grooming to keep the child from disclosing the abuse. Regarding helplessness, Dr. Washington stated that a child often might be reliant on the perpetrator for basic needs, the loss of which can be very scary for the child. In addition, a child may not be able to "physically fight off" an abuser or disobey the commands of an adult. Further, if a child discloses abuse and no one helps her or him, that reaffirms the helplessness of the child's situation. Dr. Washington explained that entrapment and accommodation involve the child feeling stuck in the abusive relationship and developing coping strategies to deal with what is happening, including internalized mental health symptoms, acting out, truancy, substance use, trauma avoidance, dissociation, or sexualized behaviors. Further, dissociation during abuse can make it harder for the child to recall specific details of the abuse. Regarding delayed, conflicted, and unconvincing disclosure, Dr. Washington explained that children tend to delay disclosure for months or years and disclose abuse incrementally. They typically do not disclose immediately because they anticipate negative consequences. Further, when abuse occurs on multiple occasions, it is difficult for the victim to remember the details and timelines. Finally, children sometimes recant a truthful disclosure of sexual abuse, perhaps because they experience a negative reaction to their disclosure and want to fix those consequences.

2. Defense Evidence

Sanchez called more than a dozen relatives to testify, including his wife Rosa, a former spouse, sons, daughters (including Monica), a stepchild, nieces, nephews, and

9

siblings. These witness testified consistently that Sanchez had never inappropriately touched them or any children they observed around him, that children, including Fatima and Beatriz, did not appear fearful or avoidant of Sanchez, and that Sanchez was not the type of person who would confront someone and call that person a liar.

Additionally, Rosa testified that when she met with Beatriz in Los Angeles, Beatriz said she had not been molested by Sanchez and that her mother Micaela was the person who was making the accusation. Rosa explained at trial that she had had a bad relationship with her sister Micaela since they were young, and Micaela had been trying to address her own immigration status for a long time. In addition, Rosa acknowledged that Sanchez had sexually abused her during their relationship. On cross-examination, Rosa said Sanchez had hit her on about three to six occasions during their 14-year relationship. Rosa also testified that when Danelia picked Giselle up the last time (on that evening in December 2007), Giselle did not say anything to Danelia.

An investigator from the district attorney's office testified that at the end of a meeting with Beatriz in September 2018 (prior to the preliminary hearing in the case), Beatriz asked if she would be able to get a U-Visa. A present deputy district attorney told Beatriz that they could discuss that topic after the case was over.

## II. DISCUSSION

Sanchez raises two related claims of error on appeal. He contends (1) trial counsel was prejudicially ineffective for failing to object to the prosecutor's comments in closing argument about the CSAAS evidence, and (2) the prosecutor's improper use of the CSAAS evidence in argument highlighted ambiguities in and likely caused misuse of the jury instruction on CSAAS evidence, CALCRIM No. 1193. We address Sanchez's claims in turn.

A. *Ineffective Assistance of Counsel*

　　1. Additional Background

Pretrial, the prosecutor moved the trial court to admit expert testimony on CSAAS, arguing that such evidence is relevant to assist the jury in assessing the credibility of the victims and would not be offered to prove that molestation actually occurred. On the other hand, Sanchez's trial counsel moved to exclude any CSAAS evidence, arguing that it was irrelevant, unduly prejudicial, and not an appropriate topic for expert testimony in the prosecution's direct case. Trial counsel also alternatively moved to limit the scope of the CSAAS evidence and for the trial court to provide a limiting jury instruction on that evidence, specifically CALJIC No. 10.64 instead of CALCRIM No. 1193 (CALCRIM 1193). The prosecutor opposed the use of the CALJIC instruction.

The trial court ruled that the prosecutor could call an expert witness to testify about CSAAS. The court explained that "the credibility of the alleged victims will be central to this case. Consequently, CSAAS testimony appears relevant and admissible. . . . However, as a reminder, this Court will only allow general testimony relating to the five myths or misconceptions." The court further ruled that prior to the expert's testimony, the court would instruct the jury with CALCRIM 1193 regarding the appropriate use of CSAAS evidence.

In accord with its pretrial ruling, the trial court instructed the jury during Dr. Washington's testimony with a modified version of CALCRIM 1193. Furthermore, Sanchez's trial counsel objected on relevance and/or Evidence Code section 352 grounds to several questions posed by the prosecutor during Dr. Washington's testimony. The trial court sustained most of trial counsel's objections.

After the close of evidence, the trial court instructed the jury with CALCRIM 1193. The instruction, which was essentially identical to the instruction provided during Dr. Washington's testimony, read: "You have heard testimony from Dr. Anna Washington regarding child sexual abuse accommodation syndrome. [¶] Dr. Anna

11

Washington's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not Fatima, Beatriz, or Giselle Doe's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of his or her testimony."

Subsequently, during his closing argument, the prosecutor referenced Dr. Washington's testimony a few times. As relevant to Sanchez's current claim of ineffective assistance of counsel, the prosecutor argued that although Dr. Washington had not worked with the three victims or on this case directly, the "general phenomenon" she explained regarding children wanting to be trusted and believed and "retreat[ing] into their shells" "when they are shut down" "is exactly what you saw in this case . . . . What she talked about is exactly what Juana said, a specific example of that 'toe in the water' phenomenon[,] getting shut down." The prosecutor also discussed the topic of dissociation, stating, in part, "that is exactly what happened with Beatriz: Delay, incremental disclosures -- [Dr. Washington] explained why this is -- kids are worried about collateral consequences."

Later in his closing argument, the prosecutor mentioned Beatriz and Dr. Washington again, saying: "[Beatriz] remembers the first time she was abused. Dr. Washington talked about how kids remember the first time." The prosecutor further asserted that Beatriz had described multiple incidents of abuse that occurred when she was in a car with Sanchez, "[b]ut then she specifically remembers one point. Just like Dr. Washington said, when kids, they have to dissociate [*sic*]." Additionally, after mentioning that Juana had told Beatriz to remain silent about the abuse because of their housing situation, the prosecutor argued, "[Beatriz] said she felt ashamed, entirely consistent with what Dr. Washington said."

In his rebuttal argument, the prosecutor discussed Fatima's prior statement to Colorado authorities that indicated Sanchez had only " 'tried to touch [Fatima's]

12

vagina.' " Regarding the inconsistency in Fatima's accusation and Fatima having previously been "shut down by Juana" on disclosure, the prosecutor explained, "Dr. Washington talked about this, about dipping your toe in, and you have to remember . . . this is Fatima's experience." In addition, the prosecutor noted for the jurors that CALCRIM 1193 applied to Dr. Washington's testimony. The prosecutor quoted from the instruction regarding the permissible use of the CSAAS evidence.

Sanchez's trial counsel did not object to any of the above-described statements by the prosecutor in argument. Furthermore, in her own closing argument, trial counsel characterized the CSAAS evidence as "ridiculous" and "absurd." Counsel urged the jurors to discount Dr. Washington's general testimony about CSAAS in the face of "the holes" and inconsistencies in the accusers' testimony and to hold the prosecution to its burden of proving Sanchez's guilt beyond a reasonable doubt.

2. Legal Principles

"Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial." (*People v. Lucas* (1995) 12 Cal.4th 415, 473.) However, "urging use of evidence for a purpose other than the limited purpose for which it was admitted is improper argument." (*People v. Lang* (1989) 49 Cal.3d 991, 1022, abrogated on another ground by *People v. Diaz* (2015) 60 Cal.4th 1176, 1190; see also *People v. Love* (1961) 56 Cal.2d 720, 730, disapproved of on other grounds in *People v. Morse* (1964) 60 Cal.2d 631, 637, fn. 2.)

" 'A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 674 (*Centeno*).) "To make out a claim that counsel rendered constitutionally ineffective assistance, 'the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting

13

prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 958; see also *Strickland v. Washington* (1984) 466 U.S. 668, 687.) We can reject an ineffective assistance of counsel claim if the defendant fails to establish either element of the *Strickland* standard. (See *Strickland*, at p. 687; *People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1008, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

A "mere failure to object to evidence or argument seldom establishes counsel's incompetence." (*People v. Ghent* (1987) 43 Cal.3d 739, 772.) "Unless a defendant establishes the contrary, we shall presume that 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 746.) Further, "[f]ailure to raise a meritless objection is not ineffective assistance of counsel." (*People v. Bradley* (2012) 208 Cal.App.4th 64, 90.)

"On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

### 3. Analysis

Sanchez contends the prosecutor, in his closing and rebuttal arguments, improperly urged the jurors to consider Dr. Washington's testimony about CSAAS as evidence of guilt. Sanchez further asserts that his trial counsel could have had no proper reason for failing to object to the prosecutor's inappropriate arguments. Sanchez also maintains that his trial counsel's deficient performance caused him prejudice.

14

The Attorney General counters that the prosecutor's comments on the CSAAS evidence were proper and, even if trial counsel had objected, it is not reasonably probable that the result of Sanchez's trial would have been different.

Sanchez has not persuaded us that his trial counsel's failure to object to the prosecutor's allusions to the CSAAS evidence fell below an objective standard of reasonableness. As support for his claim of deficient performance, Sanchez relies primarily on *People v. Clotfelter* (2021) 65 Cal.App.5th 30 (*Clotfelter*). *Clotfelter*, however, is distinguishable.

In *Clotfelter*, defense counsel failed to object to either the prosecution's expert testimony on CSAAS or other "CSAAS-type testimony" provided by two law enforcement members who "each testified that in their experience it was not uncommon for children who have been sexually abused to delay reporting and/or fail to report the abuse at all." (*Clotfelter*, *supra*, 65 Cal.App.5th at p. 63.) Defense counsel also did not object to the prosecutor's statements in rebuttal closing argument that directly referenced the expert and law enforcement testimony to rebut a defense argument that none of the alleged victims "felt annoyed or molested by Clotfelter" and to explain why "victims do and do not react to these kind of situations, how they do and do not present as victims in this case, and . . . that victims don't always show signs of abuse." (*Ibid*., italics omitted.)

The *Clotfelter* court characterized the prosecutor's argument as informing the jury "that it could use the CSAAS testimony to infer that [the three alleged victims] were victims of the crimes charged"—and the Attorney General apparently conceded as much on appeal. (*Clotfelter*, *supra*, 65 Cal.App.5th at p. 64.) The court further explained that "it is not at all apparent that the CSAAS testimony was relevant" (*ibid*.) to the charged crimes, given that two of the alleged victims denied the abuse, their parents denied "seeing anything troubling," (*ibid*.) there was a lack of any "direct evidence to the contrary," (*id*. at pp. 64–65) and there was insufficient evidence for the crimes allegedly committed against the third victim. (*Id*. at p. 65.) Under those circumstances, the court

15

opined: "We can think of no tactical reason why defense counsel would not have objected to the admission of the CSAAS testimony. And no reason why defense counsel would not have objected to the improper argument in the prosecutor's rebuttal closing that used the CSAAS testimony to infer that [the three alleged victims] had been sexually abused." (*Ibid*.) The court ultimately concluded that, "[g]iven the dearth of direct evidence that Clotfelter was sexually inappropriate with [the three alleged victims], it is reasonably probable the outcome at trial would have been different had defense counsel objected to the CSAAS testimony." (*Ibid*.)

Here, in contrast to *Clotfelter*, the CSAAS evidence was relevant because Fatima and Beatriz had accused Sanchez of molestation years after the abuse had allegedly occurred and Sanchez directly challenged the victims' credibility. (See *People v. Julian* (2019) 34 Cal.App.5th 878, 885–886; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744–1745.) Further, and more importantly, the prosecutor's statements were not improper because they did not urge the jury to conclude that the CSAAS evidence was affirmative proof that Sanchez had, in fact, molested the victims.

"Advocates are given significant leeway in discussing the legal and factual merits of a case during argument." (*Centeno*, *supra*, 60 Cal.4th at p. 666.) "When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*Id*. at p. 667.)

In the context of the evidence and parties' arguments here, we conclude the prosecutor's challenged statements were appropriately aligned with the permissible purpose for the CSAAS evidence. That is, "for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been

16

molested." (*People v. Bowker* (1988) 203 Cal.App.3d 385, 394; see also *id*. at pp. 393–394 ["the evidence must be targeted to a specific 'myth' or 'misconception' suggested by the evidence"].) We acknowledge that the assessment of an alleged sexual abuse victim's conduct for "believability" and inconsistency with the conduct of others who have been molested may assist the jury in ultimately determining whether to credit the victim's testimony that the alleged abuse in fact occurred, but the same can be said of virtually any evidence that is admitted as relevant to a witness's credibility. (See *People v. Leon* (2010) 181 Cal.App.4th 452, 460; see also Evid. Code, § 210.) The prosecutor's comments alluding to CSAAS in this case were within the bounds of what is permissible. The prosecutor argued why—considering the common misconceptions explained by Dr. Washington—the juror should not view the victims' seemingly self-impeaching behavior as damaging to their credibility. The prosecutor specifically pointed the jurors to CALCRIM 1193, saying, "It says exactly what you could use this evidence for." Additionally, Sanchez's trial counsel did not sit idle on the CSAAS evidence and the prosecutor's arguments. Counsel challenged the accuracy of Dr. Washington's testimony and its relevance to other evidence in closing argument.

Under these circumstances, we are not convinced that there is a reasonable likelihood the jurors understood the prosecutor's comments to mean that the CSAAS evidence was direct evidence of Sanchez's guilt or a diagnostic tool for establishing that the victims had in fact been sexually abused. Thus, Sanchez has failed to demonstrate that the prosecutor's argument was improper and any objection to the challenged comments would have been sustained. Because defense counsel is not expected to make a meritless objection, we conclude that Sanchez's trial counsel did not perform deficiently when she withheld objection to the prosecutor's remarks and Sanchez has failed to show that there is no satisfactory explanation for trial counsel's failure to object. (See *People v. Price* (1991) 1 Cal.4th 324, 387.) Accordingly, we reject Sanchez's claim of ineffective assistance of counsel.

17

B. *CALCRIM 1193*

Sanchez contends the prosecutor's alleged misuse of the CSAAS evidence in closing argument highlighted ambiguities in CALCRIM 1193 and likely caused the jurors to misread and misuse that instruction to apply the CSAAS evidence to infer his guilt. Sanchez asserts further that the instruction, viewed in light of the prosecutor's argument, violated his constitutional rights by lessening the prosecution's burden of proof and amounts to prejudicial error under *Chapman v. California* (1967) 386 U.S. 18.

The Attorney General counters that Sanchez forfeited his claim of error by failing to object to the instruction at trial, there is no reasonable likelihood the jurors applied CALCRIM 1193 in an unconstitutional manner, there was no violation of Sanchez's right to due process, and any error in instructing with CALCRIM 1193 was harmless under *People v. Watson* (1956) 46 Cal.2d 818.

1. Analysis

Beginning with the issue of forfeiture, as discussed *ante* (section II.A.1), Sanchez's trial counsel made a pretrial request for the use of CALJIC No. 10.64 rather than CALCRIM 1193. Counsel argued that the CALJIC instruction "is a more complete and accurate admonishment in that it reminds the jury that the research behind CSAAS begins with the assumption that a molestation has occurred." The prosecutor opposed trial counsel's request. The trial court decided to use CALCRIM 1193, explaining that that instruction "is a correct statement of the law and consistent with [the] Court's ruling" on the relevance and admissibility of CSAAS evidence in this case.

Given trial counsel's pretrial request for a different and allegedly more "complete and accurate" instruction, and notwithstanding counsel's failure to comment further on the use of CALCRIM 1193 during a jury instruction conference at the close of evidence, we conclude that Sanchez adequately preserved his current claim of error for our review. (See *People v. Riel* (2000) 22 Cal.4th 1153, 1207; see also *Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1131.) We note further that, when ruling on the parties'

18

in limine motions, the trial court granted a defense request "that each objection posed during these motions in limine constitute a continuing and ongoing objection when such evidence is admitted during the trial." The court further stated to trial counsel that "if there is an in limine motion that I feel it's necessary for you to object at the time, I will let you know."

Turning to the merits of Sanchez's claim, we review an assertion of instructional error de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "When an appellate court addresses a claim of jury misinstruction, it must assess the instructions as a whole, viewing the challenged instruction in context with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner." (*People v. Wilson* (2008) 44 Cal.4th 758, 803; see also *People v. Smithey* (1999) 20 Cal.4th 936, 963.) We also consider the entire trial record, including the arguments of counsel, in assessing the probable effect of a jury instruction. (See *People v. Jablonski* (2006) 37 Cal.4th 774, 831; *People v. Young* (2005) 34 Cal.4th 1149, 1202.) "We of course presume 'that jurors understand and follow the court's instructions.' " (*Wilson*, at p. 803.)

Sanchez contends that the last sentence of CALCRIM 1193 is "problematic" because it "does not unambiguously prohibit the jury from applying CSAAS evidence to the facts of the case as circumstantial evidence of guilt." He maintains that the instruction's "use of a double negative is cause for confusion," in that the phrase " 'not inconsistent' " may be interpreted improperly to mean "consistent with." He further asserts that the prosecutor's misuse of the CSAAS evidence to infer guilt increased the likelihood that the jurors misread CALCRIM 1193 to permit use of the CSAAS evidence to determine whether the victims' behavior is consistent with molestation and thus Sanchez's guilt.

Assessing the instruction in light of the entire record, we are not convinced by Sanchez's argument. First, CALCRIM 1193 told the jurors that the CSAAS evidence

19

could not be considered as evidence that Sanchez "committed any of the crimes charged against him." Thus, the instruction explicitly precluded use of the CSAAS evidence in a manner that Sanchez now says the jurors likely would have employed; that is, to conclude inferentially from the victims' conduct and the CSAAS evidence that Sanchez committed the charged crimes. Second, we disagree with Sanchez's reading of the language of the instruction. As a matter of logic, that particular conduct by an alleged victim is not inconsistent with having been a victim of sexual abuse does not necessarily mean the alleged victim's conduct is inevitably consistent with such victimization. Third, several courts have upheld CALCRIM 1193 as accurately informing jurors on the limited use of CSAAS evidence and have turned away various attacks on the instruction's propriety. (See *People v. Lapenias* (2021) 67 Cal.App.5th 162, 175–176 [citing *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503–504 and *People v. Munch* (2020) 52 Cal.App.5th 464, 473–474].) We agree with the conclusions of those courts. Finally, as discussed above, the prosecutor's comments in argument were not improper and thus did not exacerbate any alleged ambiguity in CALCRIM 1193.

For these reasons, we decide that it is not reasonably likely that the jurors misapplied CALCRIM 1193 such that the CSAAS evidence was used as affirmative proof of the truth of the charges or to lessen the prosecution's burden to prove Sanchez's guilt beyond a reasonable doubt. We therefore conclude that the trial court properly instructed the jury with CALCRIM 1193, and that Sanchez's right to due process was not violated.

## III. DISPOSITION

The judgment is affirmed.

20

_____

Danner, J.

WE CONCUR:


_____

Bamattre-Manoukian, Acting P.J.


_____

Grover, J.


**H048245**
*People v. Sanchez*